UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------- x

MARIUSZ RADEK,                                              :
                                                           :
                              Plaintiff,                   :
                                                           :      **MEMORANDUM &**
              -against-                                    :      **ORDER**
                                                           :
GKN AEROSPACE SERVICES                                     :      3:24-CV-1476 (VDO)
STRUCTURES LLC,                                            :
                                                           :
                              Defendant.                   :
-------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

Plaintiff Mariusz Radek, a former employee of Defendant GKN Aerospace Services Structures, LLC ("GKN"), brings this four-count action claiming (1) retaliation against workers' compensation in violation of Conn. Gen. Stat § 31-290a; (2) discrimination based on his disabilities in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), and (3) interference and (4) retaliation in violation of the Family Medical Leave Act ("FMLA").

Before this Court is Defendant GKN's Motion for Summary Judgement under Federal Rule of Civil Procedure 56 (the "Motion"). For the following reasons, the Motion is **GRANTED.**

I.    <u>**BACKGROUND**</u>

A.    **Factual Background**

The following factual background is drawn from the parties' Rule 56(a)1 Statements and the record in this case.[1] These facts are presented "in the light most favorable" to the non-

---

[1] ECF Nos. 37-2; 39-1.

moving party, Plaintiff. *Torcivia v. Suffolk Cnty.,* 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.

### 1.    Plaintiff's Employment and Job Responsibilities

GKN manufactures parts for the aerospace industry, including for passenger vehicles such as airplanes and helicopters.[2] Plaintiff began working for GKN on or about June 8, 2021 as a "water spider," a position responsible for the preparation and heat treatment of parts in ovens.[3] Plaintiff was initially supervised by Joaquin ("Wawa") Suarez and worked on the third shift.[4]

In early 2023, Plaintiff was transferred to a "preformer" position, which involved setting power and machine tools to prepare, clean, and process molds, equipment, parts, assemblies, or machinery.[5] The preformer role was considered a more skilled role than that of "water spider." In his new role, Plaintiff was supervised by Greg Cirigliano.[6]

Plaintiff was ultimately terminated from this position in approximately August 2023, as discussed in further detail below.[7]

---

[2] ECF No. 39-1 ¶ 1.

[3] *Id.* ¶¶ 3–4.

[4] *Id.* ¶ 5.

[5] *Id.* ¶¶ 44–47.

[6] *Id.* ¶ 48.

[7] *Id.* ¶ 74.

### 2.      Plaintiff's Workplace Injuries and Medical Complaints

During his employment, Plaintiff reported multiple workplace incidents, including a hand injury, chemical exposure to his eye, a shoulder injury, a fainting episode resulting in hospitalization, a hand-laceration, and an electrical shock.[8]

Specifically, on February 10, 2022, Plaintiff's hand became caught between a table cover handle and latch while removing a lid, causing a hand injury during the performance of his regular work responsibilities.[9]

On June 14, 2022, while opening a container of isopropyl alcohol, the substance splashed into Plaintiff's left eye, requiring immediate flushing by a coworker to prevent further injury.[10]

On July 6, 2022, Plaintiff sustained a right shoulder injury while turning a wrench as part of his job duties.[11] Following this incident, which Plaintiff reported 13 days after its occurrence, GKN insisted Plaintiff seek medical attention.[12] A medical provider recommended work restrictions limiting Plaintiff to light duty for the period of August 17, 2022, through October 19, 2022.[13] GKN agreed that Plaintiff would be permitted to work in full compliance with these "light duty" restrictions.[14] Plaintiff testified that a shift lead, at one point, asked him to work on something that did not comport with the restrictions. But when Suarez, his direct

---

[8] *Id.* ¶¶ 6, 7, 9, 13, 21, 34, and 58.

[9] *Id.* ¶ 7.

[10] *Id.* ¶¶ 9–10.

[11] *Id.* ¶ 13.

[12] *Id.* ¶¶ 14, 16.

[13] *Id.* ¶ 17.

[14] *Id.* ¶ 18.

supervisor, saw Plaintiff completing the task, Suarez reprimanded the lead who directed Plaintiff to work on said task.[15]

Plaintiff was then released to full duty.[16] There is no medical evidence of a chronic condition in connection with Plaintiff's shoulder injury.[17]

On August 31, 2022, Plaintiff experienced a fainting episode while at work, resulting in hospitalization, where he was treated for syncope and vertigo, conditions significant enough to require medical evaluation and removal from the workplace.[18] Suarez asked Plaintiff if he needed time off under the FMLA during his hospitalization and drove Plaintiff home upon discharge from the hospital.[19] Plaintiff's provider requested that he stay out of work through September 5, 2022. Though Plaintiff insisted on returning to work immediately, GKN refused his request.[20] Plaintiff did not have any subsequent vertigo episodes; nor was he ever diagnosed, following this incident, with chronic vertigo.[21]

On May 25, 2023, Plaintiff sustained a minor laceration to one of his hands while performing a demold.[22] When Cirigliano attempted to inspect the injury to determine whether

---

[15] *Id.* ¶ 19.

[16] *Id.* ¶ 20.

[17] *Id.*

[18] *Id.* ¶ 21, 23.

[19] *Id.* ¶¶ 21, 24.

[20] *Id.* ¶¶ 25–26.

[21] *Id.* ¶ 28.

[22] *Id.* ¶ 58.

medical attention or an incident report was necessary, Plaintiff declined to show him the injury.[23]

On May 30, 2023, Plaintiff was treated in the emergency department for what he described as symptoms of anxiety.[24] Plaintiff was excused by the emergency department provider for that day of work and permitted to return the following day.[25] Plaintiff informed his supervisors at GKN that he attributed his anxiety to GKN's discipline for his work performance.[26]

Lastly, on or about July 24, 2023, Plaintiff sustained an electrical shock to his hand while unplugging equipment at work, in the course of performing assigned tasks. Plaintiff chose not to seek medical treatment, and he did not report to GKN any issues with performing job duties as a result of this incident.[27]

Plaintiff did not request any additional workplace modifications outside of what was recommended by medical professionals. GKN did not refuse to implement any requested or recommended modifications based on Plaintiff's above-described injuries.

Plaintiff testified that certain coworkers made comments regarding his physical limitations and work performance.[28] According to Plaintiff, "one or two leads or a supervisor" at times suggested that he was unable to perform certain tasks. Specifically, he stated:

---

[23] *Id.* ¶ 59.

[24] *Id.* ¶ 19.

[25] *Id.* ¶ 30.

[26] *Id.* ¶ 31.

[27] *Id.* ¶¶ 34–36.

[28] *Id.* ¶¶ 39–41.

Like I said, certain leads, basically, said, like, "So what can you do?" Like, some of the leads from the shift, basically, were like "So it seems like you can't really doing anything. I mean, so what are we going to use you for? We can't really"– one of them, basically, used the word "useless," which I was, like, "Well, that's– I mean, I can't control what I can't control." I almost got into a little scuffle with them, because the thing is, like, I'm just listening to what Wawa is telling me. You know, I can't–I'm not going to go against it, you know. I was, like, "Yeah, if you have an issue with that, you can–you can–you're free to talk to Wawa."[29]

Plaintiff also testified, however, that he could not recall the names of the individuals who made these comments; nor could he consistently identify when the remarks occurred or how often they were made.[30] Plaintiff described the presence of workplace "cliques" and general interpersonal tension among employees, as well as one co-worker whom he characterized as not "nice to anyone."[31]

Ultimately, Plaintiff admitted that no GKN decisionmaker, including either of his two supervisors during his tenure at GKN, made any negative comments to Plaintiff regarding his hand, eye, or shoulder injuries or related restrictions.[32] When asked if Suarez ever said anything to Plaintiff suggesting that he was upset with Plaintiff having sustained workplace injuries and having spent time on limited duty, Plaintiff testified that he "felt" as if Suarez "showed kind of anger," and that it "seemed" to Plaintiff that "he was trying to poke fun at [Plaintiff] that he couldn't do certain work for certain jobs."[33] However, the record does not reflect any specific incidents, words, or actions uttered by Suarez to this effect.

---

[29] ECF No. 37-3 at 135:15–136:3.

[30] ECF No. 39-1 ¶ 40.

[31] ECF No. 39-1 ¶¶ 41–43.

[32] *Id*. ¶¶ 11, 15.

[33] ECF No. 37-3 365:9–21.

### 3.    Performance Issues and Disciplinary History

After Plaintiff was transferred to the preformer role, his supervisors stated that "it took a little bit longer" for him to understand some aspects of the role.[34] As a result, Plaintiff's training period was extended.[35]

Despite extended training, Plaintiff still exhibited performance deficiencies. For instance, on May 10, 2023, Plaintiff's supervisor, Greg Cirigliano, discussed efficiency and quality concerns with him while he was working on S92 Tip Caps, after a delay in production where flash was found on the tool, causing poor vacuum and excessive time on the job.[36]

On May 18, 2023, Plaintiff was involved in a confrontation with a coworker.[37] GKN's records state that Plaintiff was "egging on" the other technician, which led to an altercation. Plaintiff disputes that characterization, testifying that the coworker initiated the confrontation, used profanity, and threatened to "beat [Plaintiff's] ass."[38] In any case, the parties do not dispute that a confrontation occurred, and on May 25, 2023, GKN issued Plaintiff a second written warning for interpersonal misconduct in connection with this incident. The other coworker involved in the confrontation also received a written warning.[39]

On May 25, 2023, following the hand-laceration incident described above, Plaintiff refused repeated requests to permit Cirigliano to inspect the injury and walked away from him.

---

[34] *Id.* ¶ 49.

[35] *Id.* ¶ 50.

[36] *Id* ¶ 52.

[37] *Id.* ¶ 53.

[38] *Id.* ¶ 54.

[39] *Id.* ¶¶ 56–57.

The parties dispute the words exchanged between Plaintiff and Cirigliano.[40] Plaintiff does not dispute, however, that he did not show Cirigliano his hand upon request, whether immediately or upon returning from the bathroom. Plaintiff thereafter received a first written warning for insubordination.[41]

On May 30, 2023, Plaintiff failed to stamp the travelers for two work orders, and Defendant issued him an additional written warning for that failure.[42] All three written warnings issued to Plaintiff in May stated that "future misconduct may result in further disciplinary action, up to and including termination of employment."[43]

Nevertheless, Plaintiff continued to exhibit performance issues. In his 2023 mid-year review, Cirigliano rated Plaintiff "Off Track" or "Unsatisfactory" in several categories, including sign-offs for S92 Tip Injection/Deflash, efficiency, utilization, safe and secure work habits, dependability, communication, knowledge of duties, quality of work, and productivity.[44]

---

[40] *Compare* ECF No. 37-12 (in warning issued to Plaintiff by GKN, Cirigliano describes that following the laceration, the two men walked towards the bathroom. Cirigliano asked Plaintiff "how bad" the laceration was, to which Plaintiff responded that he didn't know and it didn't matter, and continued walking. When he returned, Plaintiff continued to refuse Cirigliano's requests and questions. In the conversation that ensued, Plaintiff "continued to try and validate his actions," "continued pushing the subject," and made a comment "about how he doesn't back down to people") *with* ECF No. 37-3 at 263:9–25 (Plaintiff testifying that after lacerating his hand, he was actively bleeding and en route to clean it and examine it himself, when Mr. Cirigliano said, "Let me see it." In response, Plaintiff stated, "I'll be right back....I've just got to clean this F'ing thing. It hurts like hell." When Plaintiff returned from cleaning the laceration, Cirigliano started yelling at Plaintiff, stating, "Who the hell do you think you are, yelling at me?" In response, Plaintiff conveyed, I never yelled at you. I was just, basically, yelling out in pain").

[41] ECF No. 39-1 ¶¶ 59–60.

[42] *Id.* ¶¶ 61–62.

[43] *Id.* ¶ 63.

[44] *Id.* ¶ 64.

On July 5, 2023, Defendant placed Plaintiff on a 30-day Performance Improvement Plan ("PIP").[45] To complete the PIP successfully, Plaintiff needed to receive sign-off on S92 Tip Cap injection and S92 Tip Cap deflash, reach sufficient efficiency and quality metrics, and become self-sufficient with punching on jobs.[46] During the PIP period, Cirigliano met with Plaintiff weekly, and provided weekly progress reports that Plaintiff signed.[47] Cirigliano also assisted Plaintiff with a demold on July 13–14, 2023, but Plaintiff did not complete the demold correctly.[48] During the week of July 31, 2023, Cirigliano worked with Plaintiff on using white sheets and noted that improvement was still needed because Plaintiff was, at times, taking twice as long to complete tasks.[49] Cirigliano also worked with Plaintiff on injections and deflashes, but Plaintiff did not receive sign-offs on either because of continued quality and efficiency issues, delays, and improper data submitted into the computer.[50] Plaintiff disputes aspects of GKN's evaluation, including whether the efficiency data relied upon was complete and whether Plaintiff had access to the engineer necessary to obtain certain sign-offs.[51]

Following the 30-day period allotted to carry out the PIP, Defendant determined that Plaintiff had not satisfied the required performance benchmarks and terminated his

---

[45] *Id.* ¶ 65.

[46] *Id.* ¶¶ 66–67.

[47] *Id.* ¶ 68.

[48] *Id.* ¶¶ 69–70.

[49] *Id.* ¶ 71.

[50] *Id.* ¶ 72.

[51] *Id.* ¶ 73.

employment on or about August 7, 2023.[52] Plaintiff contends that his termination followed a pattern of adverse treatment after his workplace injuries and medical issues.[53]

### B.    Procedural History

On September 27, 2024, Mr. Radek filed his complaint in the Connecticut Superior Court in the Judicial District of New Britain.[54] GKN removed the action to this Court on November 1, 2024.[55] On November 22, 2025, GKN filed the Motion.[56] Mr. Radek filed his memorandum in opposition to the Motion on October 14, 2025 (the "Opposition").[57] GKN filed its reply on October 27, 2025 (the "Reply").[58]

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113–14 (2d Cir. 2017). There is a genuine dispute of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty*

---

[52] *Id.* ¶ 73–75.

[53] *Id.*

[54] ECF No. 1-1.

[55] ECF No. 1 ¶¶ 5–10. This action was removed from Connecticut Superior Court on the basis of federal question jurisdiction as to Plaintiff's FMLA claims (ECF No. 1 ¶ 2), and on the basis of diversity jurisdiction as to Plaintiff's CFEPA claim (Plaintiff is a citizen of Connecticut and Defendant is a citizen of California, and the amount in controversy exceeds $75,000).

[56] ECF No. 37.

[57] ECF No. 39.

[58] ECF No. 41.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit," but "[f]actual disputes that are irrelevant or unnecessary" are not material and thereby cannot prevent summary judgment. *Anderson*, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986)). On summary judgment, a court views the evidence in the light most favorable to the non-moving party, resolving all ambiguities and drawing all reasonable inferences in that party's favor. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

The moving party bears the initial burden of informing the court of the basis for its motion. *Celotex Corp.*, 477 U.S. at 323. The moving party also "bears the burden of establishing that no genuine issue of material fact exists." *Rodriguez v. City of N. Y.*, 72 F.3d 1051, 1060–61 (2d Cir.1995)). Once the moving party meets this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). They cannot simply "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.2011)). Summary judgment may be granted "even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001).

## III.    DISCUSSION

### A.    Interference and Retaliation in Violation of FMLA

As an initial matter, Plaintiff has expressly conceded Counts Three and Four, which allege interference and retaliation under the FMLA.[59] *See Dipoumbi v. City of New York,* No. 09-CV-10162, 2011 WL 5966461, at *1 (S.D.N.Y. Nov. 28, 2011) ("[T]he Court grants summary judgment in Defendants' favor as to all claims which Plaintiff concedes"); *Risica ex rel. Risica v. Dumas*, 466 F. Supp. 2d 434, 438 (D. Conn. 2006) ("When a party fails to address one of the moving party's grounds for summary judgment, the court may deem the claim abandoned and grant summary judgment in favor of the moving party on that ground."). Considering Plaintiff's express concession, the Court deems Counts Three and Four abandoned and **GRANTS** summary judgment on those claims.

### B.    Disability Discrimination in Violation of CFEPA

In Count Two, Plaintiff asserts claims for (1) disability discrimination in connection with the termination of his employment, (2) failure to accommodate, and (3) discriminatory hostile work environment—all in violation of the CFEPA. Plaintiff fails on all three grounds for the primary reason that he has failed to demonstrate that he is disabled within the meaning of the CFEPA. Nevertheless, the Court addresses each of these bases in turn.

#### 1.    Disability Discrimination

Plaintiff first asserts that GKN discriminated against him on the basis of his disability, in violation of the CFEPA.

---

[59] ECF No. 30 at 3 (Plaintiff's counsel "advised that Plaintiff does not intend to pursue his FMLA causes of action.").

Defendant argues that Plaintiff cannot succeed on this claim because he cannot establish a qualifying disability, as the record lacks medical evidence demonstrating a chronic physical or mental impairment.[60] Plaintiff responds that his condition falls within CFEPA's broad definition of disability and points to evidence in the record suggesting that his impairments, considered in the aggregate, satisfy the statutory standard.[61]

Claims of disability discrimination under the CFEPA are analyzed under the *McDonnell Douglas* burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff may establish a *prima facie* case of discrimination by showing that "'(1) [he] is a member of a protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d. Cir. 2023) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

Once a plaintiff makes out a *prima facie* case of disability discrimination, "[t]he employer may then rebut the *prima facie* case by stating a legitimate, nondiscriminatory justification for the employment decision in question…. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." *Feliciano v. Autozone, Inc.*, 316 Conn. 65, 74 (2015) (cleaned up). "[T]o satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment…, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination…" *Bart v. Golub Corp.*, 96 F.4th 566, 576

---

[60] ECF No. 37-1 at 12.

[61] ECF No. 39 at 6.

(2d Cir. 2024). "[A] plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Id.*

"The standards governing discrimination under CFEPA are the same as those governing [Americans with Disabilities Act (ADA)] claims." *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 212 (D. Conn. 2012); *see also Craine v. Trinity College*, 259 Conn. 625, 637 n.6 ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."); *Hopkins v. New Eng. Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 255 (D. Conn. 2013) ("Discriminatory claims brought under CFEPA, Conn. Gen. Stat. § 46a–60 *et seq.* are construed similarly to ADA claims[.]) But in contrast with the ADA, the CFEPA is perceived to have a broader definition of disability by not requiring the employee to prove that the impairment "substantially limits one or more of the major life activities of [the] individual[.]" *Beason v. United Techs. Corp.*, 337 F.3d 271, 277 (2d Cir. 2003) (quoting 42 U.S.C. § 12102(2)(A)).

Here, Plaintiff fails to make out a *prima facie* case of discrimination under the CFEPA, because he does not demonstrate that he is disabled and thus a member of a protected class. When determining disability with the meaning of CFEPA, courts require sufficient evidence— like the production of medical records—to establish that the alleged impairments fall within the statute definitions. *Buotote v. Illinois Tool Works, Inc.*, 815 F. Supp. 2d 549, 557–58 (D. Conn. 2011).[62] Similarly, when a plaintiff fails "to offer any medical evidence substantiating

---

[62] Although courts have found that less severe physical or mental impairments may satisfy CFEPA's statutory definition of disability, such findings often arise where the existence of a disability is not disputed by the parties. *See Murray v. Wal-Mart Stores E., LP*, No. 23-CV-01019

the specific limitations to which he claims he is subject due to his conditions, he cannot establish that he is disabled within the meaning of the [CFEPA]." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 (E.D.N.Y. 2015) (quoting *Baerga v. Hosp. for Special Surgery*, No. 97-CV-0230 (DAB), 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003)) (collecting cases).

CFEPA defines "physical disability" as "any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness," including, but not limited to, conditions such as epilepsy, deafness, or reliance on a wheelchair or other assistive device. Conn. Gen. Stat. § 46a-51(15); *see Jansson v. Stamford Health, Inc.,* No. 16-CV-260 (CSH), 2018 WL 1557250, at *10 (D. Conn. Mar. 30, 2018), *reconsideration granted on other grounds*, No. 16-CV-260 (CSH), 2018 WL 1756595 (D. Conn. Apr. 11, 2018) (finding that Plaintiff met the threshold of a physical disability by the infirmities and impairments of severe mid-foot arthritis, permanent partial hearing loss, and elevated radiation levels). With respect to physical disability, "the term chronic has been defined to mean of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute." *Martinez v. State of Connecticut State Library*, 817 F. Supp. 2d 28, 51 (D. Conn. 2011) (cleaned up); *see also Gilman Bros. Co. v. Conn. Comm'n on Hum. Rts. and Opportunities*, No. CV950536075, 1997 WL 275578, at *4 (Conn. Super. Ct. May 13, 1997) (finding that employee met the definition of physical disability under the CFEPA where she suffered from carpal tunnel syndrome and tendinitis for one month prior to her termination). "Connecticut courts determine

---

(SVN), 2025 WL 2662560, at *6 (D. Conn. Sept. 17, 2025) (a concussion met the standard for disability through the stipulation of the parties).

whether an individual's injuries are 'chronic' at the time an employer makes an adverse employment decision." *Muoio v. Costco Wholesale Corp.*, No. 13-CV-44 (SRU), 2015 WL 222160, at *13 (D. Conn. Jan. 14, 2015).

CFEPA defines "mental disability" as "an individual who has a record of, or is regarded as having, one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders [DSM]." Conn. Gen. Stat. § 46a-51(20); *see also Charter Commc'ns, LLC v. Comm'n on Hum. Rts. & Opportunities,* No. HHB-CV-23-6080048-S, 2024 WL 4678361, at *5 (Conn. Super. Ct. Nov. 1, 2024) (finding that Plaintiff met the threshold of a mental disability by being diagnosed with chronic post-traumatic stress disorder—a conduction recognized in the DSM—by a licensed medical professional, and received treatment for this disorder).

Here, Plaintiff fails at the first stage of the *McDonnell Douglas* burden-shifting framework. Namely, the evidence, construed in the light most favorable to Plaintiff, does not demonstrate that Plaintiff "suffers from a disability or handicap, as defined by the [CFEPA]." *Curry*, 286 Conn. at 426.

As it relates to a physical disability, Plaintiff has not produced evidence of "any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness." Conn. Gen. Stat. § 46a-51(15). Instead, he cites to a myriad of different ailments he experienced in connection with his workplace injuries.[63] But these ailments were all temporary and unconnected. Plaintiff does not produce any medical records to substantiate these ailments or explain how any of them contributed to, caused, or

---

[63] ECF No. 39-1 at 6.

were indicative of a chronically debilitating disability. Nor does his testimony demonstrate the existence of any chronic physical condition. Therefore, given the lack of evidence in the record, the Court is unable to find that Plaintiff suffered from a physical disability.

Further, Plaintiff has not demonstrated that he "has a record of, or is regarded as having" a mental disorder defined in the DSM. Conn. Gen. Stat. § 46a-51(20). Plaintiff describes his symptoms of anxiety and depression and attributes those symptoms to the Defendant. But Plaintiff does not present evidence of a formal diagnosis of a condition defined in the DSM, as is required by the CFEPA. Thus, the Court cannot find a "record of" Plaintiff having a mental disorder or that he was "regarded as having one." Accordingly, the Court is unable to find a qualifying mental disability under the CFEPA. *See Buotote*, 815 F. Supp. 2d at 557–58; *see also Barbabosa v. Manchester Bd. of Educ.,* No. HHD-CV-166069912-S, 2018 WL 710395, at *6 (Conn. Super. Jan. 11, 2018), *aff'd sub nom.*, *Barbabosa v. Bd. of Educ. of Town of Manchester*, 207 A.3d 122 (Conn. App. 2019) (holding that the plaintiff advising a human resource specialist of anxiety and depression was insufficient to establish that she had a mental disability under the CFEPA in the absence of medical documentation evidencing such a diagnosis).

Plaintiff asks this Court to compile his workplace injuries, in the aggregate, to comport with the statutory definition of "disability." But Plaintiff has not identified any authority supporting the proposition that a series of temporary injuries may collectively constitute a qualifying disability.

Accordingly, the Court finds that Plaintiff has failed to produce sufficient evidence to establish this threshold element of his claim. Although the CFEPA standard affords plaintiffs broader latitude in demonstrating a disability than the ADA, summary judgment remains

17

appropriate where there is no record evidence of such a disability. *See Beason v. United Technologies Corp.*, 337 F.3d 271, 278 (2d Cir. 2003). Summary judgment is appropriate in cases where a plaintiff offers no medical records to substantiate a claimed disability, as here. "[B]ecause Plaintiff provides no evidence of his disability beyond his own testimony from which the extent or duration of his impairment or limitation may be discerned, and more is required in the Second Circuit, Plaintiff has failed to demonstrate CFEPA disability, and summary judgment will enter on his CFEPA claim." *Buotote,* 815 F. Supp. 2d at 558 (cleaned up). Accordingly, because the first step is not satisfied, the Court does not undertake the analysis required by the second or third steps of the *McDonnell-Douglas* framework.

### 2.    Failure to Accommodate

Plaintiff next alleges that Defendant failed to accommodate him in violation of the CFEPA.[64] Defendant responds that Plaintiff was terminated for legitimate, nondiscriminatory reasons unrelated to any disability.[65]

A claim for failure to accommodate under the CFEPA requires proof that "(1) his employer is subject to the [CFEPA]; (2) he was disabled within the meaning of the [CFEPA]; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4)…his employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025). The ADA and CFEPA apply the same standard for claims of failure to accommodate a disability. *See Martinsky v. City of Bridgeport*, 504 Fed. Appx. 43, 48 (2d Cir. 2012).

---

[64] ECF No. 1 ¶¶ 27–29; ECF No. 39 at 7–8.

[65] ECF No. 37 at 17-18.

At the outset, the Court notes that Plaintiff did not address his claim of failure to accommodate under the CFEPA in his briefing. Accordingly, the claim is deemed abandoned and the Court thus grants summary judgment on this basis alone.

However, the claim also fails on the merits. For the same reasons outlined above, the Court finds that Plaintiff was not disabled within the meaning of the CFEPA. As it was in the case of Plaintiff's claim for disability discrimination, this fact is dispositive here.

Additionally, the Plaintiff cannot establish that he was denied any requested reasonable accommodation. Plaintiff's first two workplace injuries did not require any accommodation or time off from work; nor did Plaintiff request any accommodation. As for Plaintiff's shoulder injury, his supervisor at the time, Suarez, worked with Plaintiff to determine tasks that appropriately met the light-duty restrictions from Plaintiff's doctor. And Plaintiff even testified that Suarez stopped Plaintiff when Plaintiff was engaging in activities that violated the light-duty restrictions. Plaintiff also cannot demonstrate that GKN failed to accommodate his vertigo episode. Following his hospitalization for vertigo, Plaintiff was given a return-to-work letter that he gave to GKN. Plaintiff testified that he did not ask for any accommodation and only requested brief leave listed in the return-to-work letter. In fact, he testified that he wanted to return to work as soon as possible and it was Suarez who advised him to follow doctor's orders. Plaintiff also rejected Suarez's suggestion to take FMLA leave because Plaintiff believed it was not applicable.

As for Plaintiff's alleged anxiety due to workplace stress, even if Plaintiff informed his supervisors that he was experiencing such anxiety, he failed to request any accommodation. Plaintiff specifically testified that his anxiety was not affecting his job and that he did not ask GKN to make any changes to his job.  As a result, Plaintiff cannot demonstrate that GKN failed

19

to engage in the interactive process or failed to accommodate any purported disability. For this additional reason, Plaintiff is entitled to summary judgment on Plaintiff's failure to accommodate claim in Count Two.

### 3.    Hostile Work Environment

Plaintiff also alleges that Defendant subjected him to a hostile work environment based on his asserted disability.[66] He asserts that the record reflects repeated conduct that created an abusive working environment, pointing to specific incidents that, taken together, rise to the level of a hostile work environment.[67] Defendant argues that the alleged conduct was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and was not based on any protected characteristic.[68]

To establish a hostile work environment claim under CFEPA, "a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In meeting that burden, Plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

---

[66] ECF No. 1 ¶¶ 27–29; ECF No. 39 at 7.

[67] ECF No. 39 at 7

[68] ECF No. 37-1 at 21

"Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance.'" *Id*. (quoting *Harris*, 510 U.S. at 23). A "[p]laintiff must show not only that [h]e subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Demoret*, 451 F.3d at 149. "Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'" *Id.* (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004)). Furthermore, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Alfano*, 294 F.3d at 374). Plaintiff must also demonstrate that he was "subjected to the hostility *because of [his] membership in a protected class.*" *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999)) (emphasis added).

Here, Plaintiff alleges that he felt as though Suarez, his supervisor, at times displayed "anger" with Plaintiff, and that it seemed to Plaintiff that Suarez "was trying to poke fun at [Plaintiff because] he couldn't do certain work for certain jobs." He separately brings up comments made by other co-workers, including "a lead or supervisor," suggesting he was unable to do certain tasks. Plaintiff did not know the name of the individual in question, but notably, recalled that Suarez stood up for him and told other employees that Plaintiff needed to abide by the work restrictions. Plaintiff also made vague allegations of a co-worker who made it seem like "he wanted [Plaintiff] to be removed," but also admits that that co-worker

21

was not nice to anyone. He generally speaks about the existence of a clique. Plaintiff also asserts, as part of establishing his hostile work environment claim, that "he was written up for being injured in the workplace."[69]

Because Plaintiff has failed to demonstrate a disability within the meaning of the CFEPA, none of the conduct alleged above could have been linked to a protected characteristic. Accordingly, his claim of a hostile work environment fails because he has not shown that he was "subjected to the hostility because of [his] membership in a protected class." *Kassner*, 496 F.3d at 241. In other words, Plaintiff has failed to produce evidence that the workplace was permeated with *discriminatory* intimidation, ridicule, or insult, or that any alleged conduct was sufficiently severe or pervasive to alter the conditions of his employment. Defendant is thus entitled to summary judgment on Plaintiff's CFEPA hostile work environment claim asserted in Count Two.

### C.    Retaliation in Violation of Conn. Gen. Stat. § 31-290a

Having granted the Motion, the Court now addresses the remaining claim: Count One, alleging retaliation in violation of Connecticut's workers' compensation statute. Claims arising under state workers' compensation laws are nonremovable under 28 U.S.C. § 1445(c). Specifically, under § 1445(c), a civil action arising under a state's workers' compensation laws

---

[69] ECF No. 39 at 7. The Court questions whether this is an accurate characterization of the record, even crediting all factual inferences that could be drawn in favor of Plaintiff. Regardless of the words exchanged following Plaintiff's hand laceration, Plaintiff was written up for his insubordination following said laceration, not for obtaining the injury itself. Plaintiff does not dispute the fact that he did not show his hand to Cirigliano when asked, just his reason for not doing so. Further, with respect to the laceration incident, Plaintiff never testified that he was written up "for being injured in the workplace." At most, he testified that he expressed to Suarez and Cirigliano that his anxiety resulted, in part, from getting "written up for, just hurting [him]self." ECF No. 37-3 at 393.

"may not be removed" to federal court. Where such a claim is included in a removed action, the district court must sever and remand that claim. *See* 28 U.S.C. § 1441(c)(2); *Ochoa v. New Canaan Bd. of Educ.,* No. 17-CV-1029 (MPS), 2018 WL 912840, at *1 (D. Conn. 2018) (requiring the remand of claims made nonremovable by statute upon removal per § 1441(c)). Here, both parties agree that Plaintiff's § 31-290a claim arises under Connecticut's workers' compensation laws and is thus non-removable.[70] Accordingly, Count One is **REMANDED** to the Connecticut Superior Court.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgement is **GRANTED**. Count One is **REMANDED** to the Connecticut Superior Court.

**SO ORDERED.**

Hartford, Connecticut
May 15, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

---

[70] ECF No. 1 at ¶ 4; ECF No. 39 at 1.